[S.F. No. 23422. Jan. 23, 1980.]

ENVIRONMENTAL DEFENSE FUND, INC., et al.,
Plaintiffs and Appellants, v.
EAST BAY MUNICIPAL UTILITY DISTRICT et al.,
Defendants and Respondents;
COUNTY OF SACRAMENTO, Intervener and Appellant.

COUNSEL

Thomas J. Graff, Morrison, Foerster, Holloway, Clinton & Clark, Morrison & Foerster and F. Bruce Dodge for Plaintiffs and Appellants.

John B. Heinrich and L. B. Elam, County Counsel, for Intervener and Appellant.

Evelle J. Younger, George Deukmejian, Attorneys General, Carl Boronkay, Robert H. O'Brien, R. H. Connett, Assistant Attorneys General, Roderick E. Walston, Richard C. Jacobs, Nicholas C. Yost, Jan E. Chatten, Deputy Attorneys General, Henderson, Goodwin, Marking & Rogers and Robert E. Goodwin as Amici Curiae on behalf of Plaintiffs and Appellants and Intervener and Appellant.

John B. Reilley and Robert C. Helwick for Defendants and Respondents.

Kronick, Moskovitz, Tiedemann & Girard, Adolph Moskovitz and Clifford W. Schulz as Amici Curiae on behalf of Defendants and Respondents.

P. A. Towner, Russell Kletzing, Steven R. Cohen and David B. Anderson as Amici Curiae.

---

OPINION

**CLARK, J.**—The United States Supreme Court vacated our judgment (20 Cal.3d 327 [142 Cal.Rptr. 904, 572 P.2d 1128]), and remanded the cause for consideration in light of *California v. United States* (1978) 438 U.S. 645 [57 L.Ed.2d 1018, 98 S.Ct. 2985], involving the doctrine of federal preemption.[1]

Plaintiffs and intervener appeal from judgment of dismissal following the court's sustaining defendants' demurrers without leave to amend. We reverse the judgment.

---

[1]Our earlier opinion, in addition to discussing federal preemption, also held causes of action seeking to compel defendant to reclaim waste waters must in the first instance be addressed to the State Water Resources Control Board. There is no reason to reconsider our opinion as to those causes of action because they do not involve federal preemption.

Plaintiffs, three corporations and three individuals, are residents of an area served by defendant East Bay Municipal Utility District (EBMUD), a governmental agency. Intervener is the County of Sacramento.

## Background

Delivering water to approximately 1.1 million persons in Alameda and Contra Costa Counties, EBMUD possesses water rights to 325 million gallons per day (mgd) from the Mokelumne River watershed, its principal source of water. The current average water consumption within EBMUD's service area is 212 mgd.

In the early 1960s EBMUD determined its Mokelumne River supply would be insufficient to meet the needs of its service area by the year 1985. EBMUD thereupon undertook a wide-ranging search for supplemental water supplies. In 1968, it entered an agreement with, among others, the United States Bureau of Reclamation (bureau). By the terms of this agreement, EBMUD obligated itself to perform specified conditions if it later signed a contract with the bureau.

The bureau plans to construct the Auburn Dam and Reservoir with a storage capacity of 2.3 million acre feet. EBMUD contracted with the bureau in December 1970 agreeing to purchase, beginning in the year the bureau completes its Auburn-Folsom-South Project on the American River, up to 150,000 acre feet of water annually for a period of 40 years. This water is to be delivered to EBMUD through the Folsom-South Canal. The bureau has completed the canal to the point of delivery to EBMUD. Use of the Folsom-South Canal renders the diverted water unavailable to the lower American River.

The American River rises in the Sierra Nevada and flows generally southwestward. Two of the principal forks join above the site of the proposed Auburn Dam. The third joins at Folsom reservoir about 20 miles downstream from Auburn. From Folsom Dam the American River flows to Lake Natoma formed by Nimbus Dam and then another 23 miles through the valley to Sacramento where it joins the Sacramento River. The "lower" American River has been used by the public for scenic and recreational purposes for many years, and in 1962 the county began developing an area along the river for a regional park spending $6 million.

Folsom reservoir with a storage capacity of 1 million acre feet has numerous uses, including serving in large part the water needs of the Folsom-South service area, an area south of the American River and east of the Sacramento and San Joaquin Rivers. The area is supplied with water by the Folsom-South Canal diverting water from Lake Natoma, and the canal extends along the easterly side of the service area.

An alternate diversion point for EBMUD water has been contemplated which would make it available to the lower American River. Construction of the Hood-Clay Connection would permit EBMUD to obtain its water from the Sacramento River after the American River flows into it. The proposed Hood-Clay Connection is an integral part of the bureau's proposed East Side Division of the Central Valley Project. The Sacramento River at Hood includes the waters of several other rivers in addition to the American, and construction of the proposed Hood-Clay Connection and the proposed East Side Division would permit moving Sacramento River water around San Francisco Bay to be used not only by EBMUD but also by other agencies south of the bay.

The 1968 agreement obligates EBMUD to pay a pro rata share of maintenance and operating expenses of the Hood-Clay Connection, if the bureau or the State of California constructed it and certain additional conditions occurred. If the bureau and the state did not construct the connection by 1 January 1979, EBMUD alone or with other local agencies were to undertake construction of the connection if certain determinations were made.

The United States applied to the State Water Resources Control Board (board) for appropriation permits for the Auburn Dam in 1959. (The state had previously applied for permits for an Auburn Dam in 1934.) After hearings in proceedings combining a number of applications, the board determined that there was water available for appropriation from November to June and granted permits in 1970 in Decision No. 1356. The permits do not authorize any appropriation from July to October. The decision recognized that federal, state and local agencies were conducting studies to determine flow requirements for fish and wildlife, recreation, and other beneficial uses. The board concluded that it lacked sufficient information to finally determine the terms and conditions which would reasonably protect such uses, and jurisdiction was reserved to protect recreational, fish, and wildlife uses.

The board also ordered: "11. All rights and privileges under these permits, including method of diversion, method of use and quantity of water diverted, are subject to the continuing authority of the State Water Resources Control Board in accordance with law and in the interest of the public welfare to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of said water."

Following nine days of hearing in 1971, the board in Decision No. 1400 established minimum flows essential for the protection of fish and wildlife and recreational uses. The board, after referring to the EBMUD contract and other existing and proposed contracts, pointed out that the bureau under prior permits must release from Nimbus Dam all inflow into the Auburn and Folsom reservoirs during the restricted season (July through October) and that such releases are greater than those under natural conditions because hydroelectric developments of Sacramento Municipal Utility District and Placer County Water Agency serve to increase the natural flows in the restricted period.[2]

Estimating the ultimate needs at or above Folsom and the ultimate Folsom-South Canal diversions, including the diversion to EBMUD, the board concluded that the bureau could release from Nimbus sufficient water for recreational purposes without impairing its ability to meet full requirement from the Folsom-South areas and that a reduced flow in very dry years apparently would create recreational problems of a limited-term duration without permanent damage. In 15 to 20 years the Hood-Clay Connection would be needed to pump water from the Sacramento River to the Folsom-South Canal.

The board retained jurisdiction over the permits for recreational purposes because the flow in the lower American River will change as a result of diversions above and below Nimbus.

Numerous governmental agencies, private individuals and organizations participated in the hearings. EBMUD, the bureau, and seven other public agencies sought reconsideration but the board denied reconsideration with minor modifications. None of the parties seeking reconsideration claimed that the required flows for recreational uses were insufficient or that EBMUD should have been required to use a lower diversion point.

---

[2]Although not entirely clear the two requirements apparently mean that the flow in the lower American River during the critical restricted period will always be at least equal to the natural flow and will ordinarily be substantially above the natural flow.

Although one of the plaintiffs and the County of Sacramento participated in the administrative proceedings, neither sought rehearing. In a mandamus action brought by several San Joaquin County agencies to review Decision No. 1400, County of Sacramento intervened claiming the decision was lawful.

## THE COMPLAINTS

The complaints allege: EBMUD's agreements and the bureau's completion of the Auburn-Folsom-South Project will diminish flows on the lower American River, injuring recreational opportunity, increasing salination, accelerating wild river destruction and polluting San Francisco Bay. Completion of the project will also cause loss of whitewater rafting opportunities and stream fishing on the upper American River.

EBMUD might have acquired water from the federal government at a point below the confluence of the Sacramento and lower American Rivers just as economically as from the diversion point actually chosen. As recognized by Decision No. 1400 of the California Water Resources Control Board, the lower diversion point would not impair the recreational use of the American River. EBMUD's agreement contributed to the likelihood the bureau will complete its East Side Division increasing salination of the Delta area.

EBMUD's decision to obtain water from the American River violates article X, section 2, of the California Constitution and Water Code section 100.

The complaints seek orders, declaring EBMUD lacked legal capacity to enter the 1970 contract, requiring EBMUD to use its best efforts to rescind the 1970 contract with the bureau, and prohibiting EBMUD from implementing the contract and from issuing bonds to finance the construction of facilities for transmitting and distributing American River water.

## FEDERAL PREEMPTION

Relying primarily upon *Ivanhoe Irrig. Dist.* v. *McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174], *City of Fresno* v. *California* (1963) 372 U.S. 627 [10 L.Ed.2d 28, 83 S.Ct. 996], and *Arizona* v. *California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468], we

held in our earlier decision in this case that Congress preempts "not only when direct conflict exists but also when danger exists in that state law either interferes with the [Secretary of the Interior's] expressly delegated powers, frustrates operation of the project, or limits the benefits of the project." (20 Cal.3d at p. 338.) Pointing out that under 43 United States Code sections 390b(b) and 616aaa, the secretary was to construct, operate and maintain the Central Valley Project, American River division, we concluded that the determination of the diversion point comprises a substantial part of the federal project, that construction of the Hood-Clay Connection is also within the secretary's and bureau's authority, and that the complaint failed to state a cause of action. (20 Cal.3d at p. 340.)[3]

In *California* v. *United States, supra,* 438 U.S. 645, the State Water Resources Control Board, granting the Bureau of Reclamation permits to appropriate water for the New Melones Project, attached 25 conditions to the permits. The most important conditions prohibit full impoundment until the bureau is able to show firm commitments or at least a specific plan for use of the water. The district court and the Court of Appeals held that California could not impose any conditions whatever on the United States' appropriation permits.

The United States Supreme Court (Rehnquist, J., with White, J., Brennan, J. and Marshall, J. dis.) expressly repudiated "dictum" in *Ivanhoe Irrig. Dist.* v. *McCracken, supra,* 357 U.S. 275, *City of Fresno* v. *California, supra,* 372 U.S. 627, and *Arizona* v. *California, supra,* 373 U.S. 546, preventing the board from imposing conditions on the permits granted to the United States which are not inconsistent with congressional authorization of a project. The court concluded that California may impose any condition not inconsistent with congressional directive. (438 U.S. at pp. 675-676, 678-679 [57 L.Ed.2d at pp. 1038-1039, 1041].) Absent conflict with congressional directive, state law must be complied with in the "'control, appropriation, use, or distribution of water.'" (438 U.S. at p. 675 [57 L.Ed.2d at p. 1038].)[4]

---

[3]In his concurring opinion, Justice Richardson, stating that the federal decisions were not directly in point and were unclear, concurred in the lead opinion's analysis. (20 Cal.3d at pp. 345-346.) In the dissenting opinion, Justice Mosk urged that preemption was irrelevant to the issue whether EBMUD as a state agency could properly initiate a contract with the federal government in violation of state law and, even if relevant, federal law provided that state law was controlling. (20 Cal.3d at pp. 346-350.)

[4]The court remanded the case for determination of claims that the conditions imposed by the board were in conflict with congressional directive.

■ To the extent the complaints challenge the contract on the ground that construction of the dam and the Folsom-South Canal constitutes a violation of state law, there is federal preemption. Congress has authorized the construction of the dam and the Folsom-South Canal (43 U.S.C. §§ 616aaa-616fff) and a holding that the construction of the dam is contrary to state law is contrary to congressional directive.

■ However, location of the diversion point downstream on the basis of state law would not be inconsistent with congressional directive. 43 United States Code sections 616aaa-616fff authorizing the Auburn-Folsom-South unit, American River division, provides in section 616ddd for the secretary to locate and design the works and facilities giving due consideration to the California Water Plan and consulting with local interests through public hearings. A section requiring the secretary to seek conformity to local wishes does not make state law inapplicable.

Accordingly, to the extent the complaints challenge the location of the diversion point as being violative of California law there is no federal preemption.

PRIMARY JURISDICTION EXHAUSTION OF REMEDIES AND RES JUDICATA

As pointed out above, the board has granted appropriation permits for the Auburn Dam in contemplation of the EBMUD contracts, made provision for recreational uses of the American River, and retained jurisdiction to consider diversion points. ■ Claiming that the courts have concurrent jurisdiction to determine whether the construction of the Auburn Dam and the choice of the diversion point constitute unreasonable use of water, plaintiffs, original and in intervention, rely upon California Constitution, article X, section 2, and Water Code, section 100. Those provisions declare that the general welfare requires water resources be put to beneficial use to the fullest extent of which they are capable and that the waste or unreasonable use of water be prevented. In addition the constitutional provision declares: "This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."[5]

---

[5]Article X, section 2, provides in full: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the

## A. ADMINISTRATIVE PROCEDURE

■ We pointed out in our prior decision in this case: "The scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts. What constitutes reasonable water use is dependent upon not only the entire circumstances presented but varies as the current situation changes. As this court noted in *Joslin v. Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140 [60 Cal.Rptr. 377, 429 P.2d 889], 'what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* from statewide considerations of transcendent importance.'" (20 Cal.3d at p. 344.)

Complex water development projects like the instant one involve three complex matters—the development of additional water resources,

reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. *This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained.*" (Italics added.)

Water Code section 100 provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." Additionally, Water Code section 101 provides: "Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this and the next preceding section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing in this or the next preceding section shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled."

the use of the waters developed, and the potential harm which may occur to existing resources due to the new development and uses.

In obvious recognition of our public policy to require water resources be put to beneficial uses and not wasted, the complexity of the problems presented, the numerous persons affected by water development projects and the necessity of continued regulation to meet changing circumstances, the Legislature has provided a comprehensive system for development, issuance, and administrative regulation of appropriative water rights.

■ Since 1914, the effective date of the Water Commission Act, exclusive jurisdiction over the granting and administration of appropriative rights has been delegated to the board and its statutory predecessors. The board's duties and responsibilities over appropriative rights include insuring that they meet the mandate of article X, section 2. (Wat. Code, § 1050.)[6]

### 1. APPLICATIONS AND ISSUANCE OF PERMITS TO APPROPRIATE WATER

Any person or entity, public or private, wishing to appropriate water covered by the act must file an application for a permit with the board. (Wat. Code, § 1260.) Each application must set forth the source of water supply, the nature and amount of the proposed use, the location and description of the proposed headworks, ditches, canals, and other works, the proposed place of diversion, the place where it is intended to use the water, the time within which it is proposed to begin construction, the time required for completion of construction, and the time for complete application of the water to the proposed use. (Wat. Code, § 1260.)

Once the application is filed, the board must issue a "Notice of Application," which is a resumé of the information contained in the application. (Wat. Code, §§ 1300 and 1301.) The notice must be delivered to the district attorney and board of supervisors of the county where the diversion is proposed. (Wat. Code, § 1300.) For appropriations in excess of 3 cubic feet per second or for more than 200 acre

---

[6]Water Code section 1050 provides: "This division is hereby declared to be in furtherance of the policy contained in Section 3 of Article XIV of the Constitution of the State and in all respects for the welfare and benefit of the people of the State, for the improvement of their prosperity and their living conditions, and the board and the department shall be regarded as performing a governmental function in carrying out the provisions of this division." (Former § 3 of art. XIV of the Const., now art. X, § 2.)

feet per annum storage, the notice must also be published once a week for 3 successive weeks in a newspaper of general circulation in the county wherein the point of diversion lies. (Wat. Code, §§ 1310-1317.) Additionally, the board must send copies of the notice by registered mail to each person who is known to the board and who, in its judgment, is interested in the application. (Wat. Code, § 1321.) The purpose of the notice procedure is to provide all interested parties with the opportunity to protest the application. (Wat. Code, § 1330.) Depending on the amount of water involved, the board must allow a minimum of either 40 days or 60 days for the filing of protests. (Wat. Code, §§ 1302, 1303.) Protests may be filed by *"any person."* (Wat. Code, § 1330.) The protest may be based on interference with a prior vested water right (Cal. Admin. Code, tit. 23, § 719, subd. (b)), or *on grounds that the appropriation will not best conserve the public interest or will be contrary to law.* (Cal. Admin. Code, tit. 23, § 719, subd. (e).)

Once an application has been filed, interested parties notified, and protests received, the board issues a notice of hearing. (Wat. Code, § 1341.)

All protestants and interested parties may participate in the hearings. (Cal. Admin. Code, tit. 23, § 733.)

California law requires the board to consider specific factors relating to beneficial use and the public interest before deciding whether to grant a permit.

First, the board shall allow the appropriation only under such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated. (Wat. Code, § 1253.)

Second, the board must reject the application if, in its judgment, the appropriation would not best conserve the public interest. (Wat. Code, § 1255.)

Third, the board must consider the relative benefit to be derived from all beneficial uses of the water concerned, including domestic, irrigation, municipal, and industrial use, as well as use for preservation and enhancement of fish, wildlife, and recreational uses. (Wat. Code, § 1257.) Furthermore, the benefit to be derived from the reuse or recla-

mation of the water sought to be appropriated, as sought by the application, must be considered. (Wat. Code, § 1257.)

Finally, the board must consider any water quality plans which have been established. (Wat. Code, § 1258.)

If, after considering the application and the factors discussed above, the board concludes that a right to appropriate water should be granted, it issues a permit. (Wat. Code, § 1380.) Board action on applications is reviewable by writ of mandate in the superior court. (Wat. Code, § 1360.)

Water Code section 1394, subdivision (a) empowers the board to retain jurisdiction to revise or supplement the terms and conditions of a permit if the board finds that sufficient information is not available to finally determine the terms and conditions which will reasonably protect vested rights without resulting in a waste of water or which will best develop, conserve and utilize in the public interest the water sought to be appropriated, and that a period of actual operation will be necessary in order to secure the required information.

## 2. SUPERVISION OVER PERMITS AND ISSUANCE OF LICENSES

■ The permit gives the right to take and use water only to the extent and for the purpose granted and under the terms and conditions of division 2 of the Water Code and as specified in the permit (Wat. Code, §§ 1381-1391), and the right is conditional. To perfect the right, the permittee must diligently commence and complete construction of the project and apply the water to beneficial use in accordance with the law and the terms of the permit. (Wat. Code, §§ 1395-1397; *Madera Irr. Dist. v. All Persons* (1957) 47 Cal.2d 681, 690-691 [306 P.2d 886].) The board requires the filing of annual progress reports by each permittee detailing the progress made in these activities. (Cal. Admin. Code, tit. 23, § 782.) As soon as project construction and application of the water to full beneficial use have been accomplished, the information is reported to the board (Wat. Code, § 1600), and the board's staff conducts an inspection (Wat. Code, § 1605). If the board finds that the permittee has completed construction and has applied the water to beneficial use in accordance with the law and the permit, it issues a license which confirms the appropriation. (Wat. Code, § 1610.) If the findings are favorable to the permittee, the issuance of the license is

mandatory and ministerial. (Wat. Code, § 1610, Cal. Admin. Code, tit. 23, § 2712, subd. (c).) Licensees are also required to file periodic reports of water use with the board. (Cal. Admin. Code, tit. 23, § 782.)

3. PROCEDURE FOR REVOKING APPROPRIATIVE PERMITS AND LICENSES

In addition to prescribing the procedure outlined above, the Legislature completed the comprehensive scheme for administrating appropriative rights by empowering the board to see to it that the rights, once granted, would not be misused to the detriment of the people of the state. Both permits and licenses are made subject to partial or total revocation if the water is not placed to beneficial use in accordance with their terms and conditions and in accordance with division 2 of the Water Code. (Wat. Code, §§ 1410, 1651, 1675.) Division 2 contains the policy mandates governing actions by the board in approving and administering appropriative rights. Hearing requirements and *judicial review procedures are established to assure that board action under these sections properly balances the rights of the appropriator with the needs of the public.* (Wat. Code, §§ 1410-1415, 1675-1677.)

■ In summary, and in the words of *Modesto Properties Co.* v. *State Water Rights Bd.* (1960) 179 Cal.App.2d 856, 860 [4 Cal.Rptr. 226], the Legislature devised "a plan which was commensurate in scope with the constitutional amendment [art. X, § 2]," and delegated to the board by the Water Commission Act the authority to protect the public interest not only in the issuance of appropriative permits and licenses but also in their later administration. As pointed out in our earlier decision in this case (20 Cal.3d at p. 342), the board "has been granted broad authority to control and condition water use, insuring utilization consistent with public interest. (Wat. Code, § 1257.) This authority includes protection of the environment. (*Id.*) The [board's] powers extend to regulation of water quality and prevention of waste. (E.g., Wat. Code, §§ 100, 275.) It has adopted administrative regulations to prevent waste and unreasonable use."

B. ADMINISTRATIVE PROCEDURE AND THE COURTS

The provisions of article X, section 2 of the California Constitution being self-executing (see fn. 4, *ante*), the courts have traditionally enforced the proscriptions against unreasonable uses and unreasonable methods of diverting water. (E.g., *Joslin* v. *Marin Mun. Water Dist.*

(1967) 67 Cal.2d 132 [60 Cal.Rptr. 377, 429 P.2d 889]; *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486].)

In our prior opinion in the instant case, we considered the relationship between legislative provisions governing administrative regulation of reclamation of waste water and judicial enforcement of the self-executing provisions of article X, section 2. Based on statutory regulation of such reclamation, the potential dangers to public health, the problems of feasibility of reclamation, and the complexity of the issues, we concluded that courts should not exercise concurrent jurisdiction of proceedings to compel water agencies to reclaim waste water, but should defer in the first instance to the expertise of the appropriate administrative agencies. (20 Cal.3d 327, 341 et seq.)

We recognized that courts had traditionally exercised jurisdiction of claims of unreasonable water use and we distinguished cases involving competing claims as to the reasonableness of normal water use, pointing out that they did not involve the complexity of the waste water reclamation issue or the "transcendent interests of public health and safety." (20 Cal.3d 327, 344.)

Recently, this court again considered both the judicial and administrative enforcement of article X, section 2. The Legislature established a comprehensive administrative scheme with judicial review of determinations of riparian rights in a stream system between competing users. This court held that prior court adjudications in original proceedings between some users would not be res judicata in the later administrative proceeding and that the latter proceeding would result in a final and comprehensive determination of user rights "in light of what constitutes a reasonable beneficial use under article X, section 2." (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 359-360 [158 Cal.Rptr. 350, 599 P.2d 656].)

This court emphasized that private judicial litigation involves piecemeal adjudication determining only the relative rights of the parties before the court, whereas in administrative proceedings comprehensive adjudication considers the interests of other concerned persons who may not be parties to the court action. (25 Cal.3d at pp. 345, 347, 359-360.)

Although denying res judicata effect to prior private litigation, the court expressly recognized that superior courts have adjudicated claims

between riparian owners (25 Cal.3d at p. 347), and nothing in the opinion suggests that traditional court enforcement is to be abandoned.

 Apart from overriding considerations such as are presented by health and safety dangers involved in the reclamation of waste water, we are satisfied that the courts have concurrent jurisdiction with the legislatively established administrative agencies to enforce the self-executing provisions of article X, section 2. Private parties thus may seek court aid in the first instance to prevent unreasonable water use or unreasonable method of diversion.

The fact that the board has retained jurisdiction to consider the diversion point of appropriated water does not deprive the superior court of jurisdiction. Express retention of jurisdiction of a matter not previously determined is merely express recognition of its statutorily granted concurrent jurisdiction. The board has not determined whether diversion of the EBMUD water through the Folsom-South Canal rather than diversion at Hood constitutes an unreasonable method of diversion.

The judgment is reversed with directions to grant appellants leave to amend their complaints to allege that diversion of EBMUD's water through the Folsom-South Canal constitutes an unreasonable method of diversion.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Respondents' petition for a rehearing was denied February 20, 1980.