Filed 7/9/18; Certified for Publication 8/1/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RESTORE HETCH HETCHY,<br><br>    Petitioner and Appellant,<br><br>        v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>    Respondents;<br><br>MODESTO IRRIGATION DISTRICT et al.,<br><br>    Real Parties in Interest and Respondents. | F074107<br><br>(Super. Ct. No. CV59426)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County. Kevin M. Seibert, Judge.

Lozeau Drury, Michael R. Lozeau, Richard T. Drury, Meredith S. Wilensky; Richard M. Frank for Petitioner and Appellant.

Rossmann and Moore, Antonio Rossmann and Roger B. Moore for Huey Johnson, Daniel Lungren, John Van De Kamp, Douglas Wheeler and Earth Island Institute; Olson Hagel & Fishburn, Deborah B. Caplan and Richard C. Miadich for Barbara Griffin and Robert Binnewies; Deborah A. Sivas, Alicia E. Thesing and Isaac Cheng for Environmental Law Clinic as Amici Curiae on behalf of Petitioner and Appellant

Dennis J. Herrera, City Attorney, Yvonne R. Meré, Joshua D. Milstein, Matthew D. Goldberg, Mollie M. Lee and Aileen M. McGrath, Deputy City Attorneys, for Respondents.

Hanson Bridgett, Kimon Manolius, Allison C. Schutte, Nathan A. Metcalf and Adam W. Hofmann for Real Party in Interest and Respondent Bay Area Water Supply and Conservation Agency.

Griffith & Masuda, Roger K. Masuda and David L. Hobbs for Real Party in Interest and Respondent Turlock Irrigation District.

O'Laughlin & Paris, William C. Paris, III and Timothy J. Wasiewski for Real Party in Interest and Respondent Modesto Irrigation District.

Stanly T. Yamamoto, District Counsel and Erick D. Soderlund, Assistant District Counsel for Santa Clara Valley Water District; Bartkiewicz, Kronick & Shanahan and Ryan S. Bezerra for Association of California Water Agencies and Northern California Water Association as Amicus Curiae on behalf of Respondents.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor, Daniel M. Fuchs and Jeffrey P. Reusch, Deputy Attorneys General, for State Water Resources Control Board as Amicus Curiae.

-ooOoo-

Appellant Restore Hetch Hetchy appeals from the trial court's judgment sustaining appellees' City and County of San Francisco, San Francisco Public Utilities Commission, Bay Area Water Supply and Conservation Agency, Turlock Irrigation District, and Modesto Irrigation District, demurrer. Restore Hetch Hetchy petitioned the trial court for a writ of mandate to declare the Hetch Hetchy Reservoir and O'Shaughnessy Dam unreasonable methods of diverting water under article X, section 2 of the California

Constitution (hereafter, art. X, § 2). The trial court concluded Restore Hetch Hetchy's position was preempted by the Raker Act, (See Pub.L. No. 63–41 (Dec. 19, 1913) 38 Stat. 242; hereafter, "Raker Act") federal legislation granting certain rights-of-way to San Francisco subject to various conditions, and that actions brought under article X, section 2 are subject to a four-year statute of limitations that began running when article X, section 2 became effective in 1928. For the reasons set forth below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The Hetch Hetchy Valley is a long, narrow, and granite-cliff bordered valley through which a portion of the Tuolumne River flows. It is in the northwest portion of the federally controlled Yosemite National Park. Prior to the 1920's, Hetch Hetchy Valley was a well-known and beloved natural resource with views said to rival those of Yosemite Valley itself. As early as 1901, however, the valley was also an area of contention, with San Francisco seeking to use the valley for long-term water storage and power generation needs.

In 1913, after several earlier attempts by San Francisco to create a dam in the Hetch Hetchy Valley had stalled, the House of Representatives took up the issue through what became known as the Raker Act. Despite strong support for preserving the Hetch Hetchy Valley, the Raker Act ultimately granted San Francisco "the right to construct a number of dams, powerhouses, pipelines and related facilities in the Tuolumne watershed in order to make use of their water rights in the area," including within the Hetch Hetchy Valley. As a result of this legislation, the O'Shaughnessy Dam was completed in 1923, flooding the Hetch Hetchy Valley to create the Hetch Hetchy Reservoir. The modern water system, of which the Hetch Hetchy Reservoir is a part, now serves roughly 2.6 million residents and businesses in the Bay Area. Approximately 25 percent of the water stored in that system is retained by the O'Shaughnessy Dam.

3.

Restore Hetch Hetchy's petition alleges that the use of the O'Shaughnessy Dam to divert water into the Hetch Hetchy Reservoir is an unreasonable method of diversion under article X, section 2.[1]  According to the petition, diverting water at the O'Shaughnessy Dam is unreasonable for several reasons.  These include assertions related to other uses of the valley, such as aesthetic and scenic beneficial uses that are being destroyed by the flooding of the valley and access restrictions precluding beneficial recreational uses such as hiking, camping, swimming, boating, and fishing.  They also include assertions related to the economic and societal benefits of the dam that claim the dam is unnecessary in light of later water diversion projects such as the Don Pedro Reservoir and that the economic value of a pristine Hetch Hetchy Valley greatly exceeds the costs of returning the valley to its natural state while maintaining San Francisco's water reservoirs.

The trial court sustained the demurrer filed in this case on two grounds.  In the first, the court concluded appellant's application of article X, section 2, asserting that the O'Shaughnessy Dam and Hetch Hetchy Reservoir constituted an unreasonable diversion of water under modern considerations, was preempted by the Raker Act.  In the second, the court determined that actions for relief under article X, section 2 are subject to the state's catch-all four-year statute of limitations and that appellant's allegations showed their claim arose at approximately the time the O'Shaughnessy Dam was completed.  When Restore Hetch Hetchy opted not to file an amended petition, the trial court entered a judgment of dismissal.

This appeal timely followed.

---

[1]     The trial court noted and the parties do not dispute on appeal that appellant's petition is limited to the assertion there is an unreasonable diversion of water and does not allege waste, unreasonable use, unreasonable method of use, or any other potential claims under article X, section 2.

4.

## DISCUSSION

Restore Hetch Hetchy raises two issues.[2]  First, it contends there is no conflict between article X, section 2 and the Raker Act and, therefore, federal preemption does not apply.  Second, it contends claims brought under article X, section 2 are not subject to any statute of limitations.  In resolving this matter, we consider only the first contention.[3]

Upon San Francisco's demurrer, the trial court concluded that the claims brought by Restore Hetch Hetchy were preempted by the Raker Act.  Restore Hetch Hetchy argues this determination was improper on the general contention that section 11 of the Raker Act, known colloquially as a savings clause, precludes any finding that the Raker Act conflicts with California's water laws.  We do not agree with this position. Congress's relevant intent, as readily discerned from the text of the Raker Act, was to flood the Hetch Hetchy Valley through the permanent creation of a dam on federal lands. Although a broad savings clause was then utilized to preserve the applicability of California's water laws, relevant principles of the preemption analysis confirm that broad preemption protections for state laws may not eviscerate those components of a law purposefully enacted by Congress.  In this instance, Congress specifically ordered the creation and operation of a dam, intending for the continued operation of this structure. Accordingly, as detailed below, the savings clause contained in the Raker Act does not preclude a finding of conflict between the asserted claims of this case and the express

---

[2]     We recognize and thank the various amici that filed briefs in this matter.  In support of Restore Hetch Hetchy was Stanford's Environmental Law Clinic on behalf of various environmental law professors; Huey Johnson, Daniel Lungren, John Van De Kamp, Douglas Wheeler and the Earth Island Institute; and Barbara Griffin and Robert Binnewies.  In support of respondents were the Santa Clara Water District; and the Association of California Water Agencies and Northern California Water Association.  In support of neither party was the State Water Resources Control Board.

[3]     Restore Hetch Hetchy has filed two requests for judicial notice.  Respondents have filed one request for judicial notice.  Neither side has filed objections.  We therefore grant each of the requested motions but note we only rely on such materials if directly cited herein.

determination by Congress to divert water on a permanent basis at the site of the O'Shaughnessy Dam.

## *Standard of Review*

"A demurrer tests the legal sufficiency of the factual allegations in a complaint." (*Regents of University of California v. Superior Court* (2013) 220 Cal.App.4th 549, 558.) "When a demurrer is sustained, appellate courts conduct a de novo review to determine whether the pleading alleges facts sufficient to state a cause of action under any possible legal theory." (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1242.) "When conducting this independent review, appellate courts 'treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law.' " (*Esparza v. Kaweah Delta Dist. Hospital* (2016) 3 Cal.App.5th 547, 552.) We may also consider matters subject to judicial notice and will affirm the judgment if any ground for the demurrer is well taken. (*Ramirez v. Tulare County Dist. Attorney's Office* (2017) 9 Cal.App.5th 911, 924.)

## *Overview of Relevant Laws*

*Article X, Section 2 of the California Constitution*

In relevant part to the issues arising in this case, article X, section 2 provides:

"It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water."

6.

Initially enacted in 1928 under a different constitutional heading, article X, section 2 was introduced to overturn a string of prior California Supreme Court cases that had placed riparian water rights ahead of appropriative water rights by exempting riparian right-holders from the requirement that their water use be reasonable in the context of disputes with appropriative right-holders. (*See Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673, 696, 699–700.) This constitutional amendment made the "rule of reasonable[ness]" the law of the land and "the overriding principle governing the use of water in California." (*People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743, 749–750 (*Forni*).)[4] Notably, and as alluded to in amicus briefing from the State Water Resources Control Board, the rule of reasonableness was already applicable to nearly all uses aside from riparian versus appropriative owners. (See *Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 367 [listing pre-amendment applications of the rule of reasonableness].) As such, the amendment made little difference with respect to disputes between and among appropriative owners.

*The Raker Act*

The Raker Act has been broadly summarized in several prior cases. As the United States Supreme Court described it, the Act "granted the City and County of San Francisco, subject to express conditions, certain lands and rights-of-way in the public domain in Yosemite National Park and Stanislaus National Forest. The Act in terms declared that this, known as the 'Hetch-Hetchy' grant, was intended for use by the City both in constructing and maintaining a means of supplying water for the domestic purposes of the City and other public bodies, and in establishing a system 'for generation and sale and distribution of electric energy.' " (*U.S. v. San Francisco* (1940) 310 U.S. 16, 18, fn. omitted.) In terms more relevant to the issues raised here, the Act has been

---

[4] The rule of reasonableness is, in general, a requirement that those making use of their water rights do so in a reasonable manner under the circumstances. (*Forni*, *supra*, 54 Cal.App.3d at pp. 749–750.)

described as something "passed to provide needed water for San Francisco by authorizing the flooding of Hetch Hetchy Valley and the creation of the Hetch Hetchy Reservoir in Yosemite National Park." (*Sierra Club v. FERC* (1985) 754 F.2d 1506, 1510 (*Sierra Club*).)

The Act has been described as "much like a contract. It carefully specifies the obligations of the grantee and the grantor." (*United States v. City & County of San Francisco* (E.D.Cal. 2006) 446 F.Supp.2d 1140, 1143.)[5] "Of perhaps greater moment, the Act establishes a cooperative effort of the United States, acting through the Secretary, and the State of California in providing water and power to Bay Area inhabitants." (*Starbuck v. City & County of San Francisco* (9th Cir. 1977) 556 F.2d 450, 456–457.) Thus, while the Act "granted rights of way to the city of San Francisco for the construction of a dam across the Tuolumne River in Yosemite National Park[,] . . . [i]n return, it placed construction of the dam and other necessary facilities under the supervision of the Secretaries of Interior (for construction in Yosemite National Park) and Agriculture (for construction in Stanislaus National Forest)." (*Sierra Club*, *supra*, 754 F.2d at p. 1510.) Likewise, the Act required conformity "to all regulations adopted and prescribed by the Secretary of the Interior governing the Yosemite National Park and by the Secretary of Agriculture governing the Stanislaus National Forest," (Raker Act, § 4) and that the City "build and assign to the United States certain roads and trails between specified points in Yosemite National Park" and otherwise transfer certain lands to the government, among various other requirements. (See *United States v. City & County of San Francisco* (N.D.Cal. 1953) 112 F.Supp. 451, 452; Raker Act, § 9(t).)

At the same time, the Act has always been somewhat controversial. "The Act met with strong opposition from environmental groups who objected to the destruction of the

---

[5] Much of the litigation over the Raker Act has involved the United States and the City and County of San Francisco, causing many cases to share the same name.

pristine splendor of the Hetch Hetchy Valley. Instrumental in the defeat of the environmental viewpoint was the demonstrated need for a cheap and abundant supply of water to accommodate the growing power and water demands of the Bay Area. The legislative debates are replete with discussion of the projected population growth of the Bay Cities[6] as well as of San Francisco proper and the demand for water which such growth would entail. Not only were the legislators cognizant of the Bay Cities' need for new water supplies, but they were also aware that the financial resources of the Bay Cities would be needed to help build the facilities necessary to generate Hetch Hetchy water and electric power." (*City of Palo Alto v. City & County of San Francisco* (9th Cir. 1977) 548 F.2d 1374, 1376, fns. omitted.) Such environmental disputes carry through to the present litigation.

This controversy, though, was overcome by a political agreement and recognition that building a dam at the Hetch Hetchy site was a fundamental need for San Francisco and the surrounding areas. As the legislative analysis of the bill shows, whether or not to build a dam at Hetch Hetchy had been hotly disputed for around 12 years. Plans to build a dam to supply water to the Bay Area began in 1900 and were contested by not only environmental interests but also by farming and irrigation interests. However, a dire need for water in the San Francisco area and the ability to ensure the Tuolumne river did not run dry in low water years or summer and fall months led all but the environmentally concerned parties to eventually support building the dam. From the Federal side, the Secretary of the Interior noted that both "the private engineers and the War engineers have reached the conclusion that this dam site must eventually be used" and that other California interests would push for the dam in short time if not approved immediately. (See H.R. No. 7207, 63d Cong., 1st Sess. (1913).) The Secretary concluded, "My

---

**6** In this litigation, the Bay Cities comprised seven cities and eight districts in the San Francisco Bay area opposing San Francisco.

judgment is unequivocally in favor of the use of the floor of the valley. If San Francisco does not get it, some one else must; it is too precious a reservoir site to remain unused." (*Ibid.*) Thus, to ensure all interests were fairly treated, the legislative history shows the United States entered into the grant in the structure chosen because "the United States, having sole jurisdiction over the national park, has the right to refuse the grant and also has the right in making the grant to impose certain conditions upon the grantee." (*Ibid.*)

Looking more directly to the text of the Act, the multifaceted nature of the grant becomes clearer. Section 1 grants to the city and county of San Francisco several rights of way, including "all necessary rights of way along such locations and of such width . . . as in the judgment of the Secretary of the Interior may be required . . . for the purpose of constructing, operating, and maintaining . . . conduits for conveying water for domestic purposes and uses to the city and county of San Francisco; . . . constructing, operating, and maintaining power and electric plants, . . . telephone and telegraph lines, and . . . roads, trails, bridges, tramways, railroads, and other means of locomotion." (Raker Act, § 1.) The Act further grants rights of way over "such lands in the Hetch Hetchy Valley and Lake Eleanor Basin within the Yosemite National Park, and the Cherry Valley within the Stanislaus National Forest . . . as may be determined by the Secretary of the Interior to be actually necessary for surface or underground reservoirs, diverting and storage dams." (*Id.*, § 1.) These right of way grants are immediately conditioned upon specific action by San Francisco.

Thus, in section 4, the grant requires San Francisco to "conform to all regulations adopted and prescribed by the Secretary of the Interior governing the Yosemite National Park" while limiting the use of timber cut from the lands, requiring the construction of trails, and mandating the erection of permanent structures, including dams, "be slightly and of suitable exterior design and finish so as to harmonize with the surrounding landscape and its use as a park." (Raker Act, § 4.) Section 5 requires that "construction

10.

of the aforesaid works shall be prosecuted diligently, and no cessation of such construction shall continue for a period of three consecutive years" on the penalty of potential forfeiture of the grant, while again confirming that "in the exercise of the rights granted by this Act, the grantee shall at all times comply with the regulations herein authorized." (*Id.*, § 5.) Related to this requirement, in section 9, subdivision (k), the statute provides that "when the said grantee begins the development of the Hetch Hetchy Reservoir site, it shall undertake and vigorously prosecute to completion a dam at least two hundred feet high, with a foundation capable of supporting said dam when built to its greatest economic and safe height." (*Id*., § 9(k).)

Section 6 provides that "the grantee is prohibited from ever selling or letting to any corporation or individual, except a municipality or a municipal water district or irrigation district, the right to sell or sublet the water or the electrical energy sold or given to it or him by the said grantee," again on the potential penalty of forfeiting the right of way. (Raker Act, § 6.) Section 9 then provides a substantial number of regulations and provisos related to water usage and water rights attending to the grant. Thus, in section 9, subdivision (a), the Act requires five specific "sanitary regulations" including the exclusion of refuse from within 300 feet of any reservoir, the filtration of sewage from permanent camps and hotels in the watershed, and bathing or other polluting activities "within the limits of the Hetch Hetchy Reservoir" and nearby waters. In subdivisions (b) through (g), the Raker Act provides a series of water provisions and water rights protections for the Modesto and Turlock Irrigation Districts. These include formal recognition of the senior rights of the irrigation districts, minimum guarantees regarding water flows, obligations to sell water to the districts, and oversight by the Secretary of the Interior. In the obligation to sell water to the irrigation districts, San Francisco must sell the water at cost, but with "a fair proportion of the cost to said grantee of the conduit, lands, dams, and water-supply system included in the Hetch Hetchy and Lake Eleanor

sites" included.  (*Id*., § 9, subd. (d).)  In subdivision (h), the Raker Act requires that San Francisco "not divert beyond the limits of the San Joaquin Valley any more of the waters from the Tuolumne watershed than, together with the waters which it now has or may hereafter acquire, shall be necessary for its beneficial use for domestic and other municipal purposes," thereby limiting in some degree the uses to which San Francisco can put water retained in the dams.

The remainder of the Act contains additional restrictions and relevant sections. These include substantial requirements related to capacity, resale, and the provision of electricity required to be generated through the agreement, along with building requirements San Francisco must pay for, water that must be sold to the United States, and water that must be provided to authorized occupants within a mile of the planned reservoirs.  (Raker Act, § 9, subds. (i)–(u).)  Following these additional provisos, section 11 consists of a savings clause, providing "this Act is a grant upon certain express conditions specifically set forth herein, and nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the State of California relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with the laws of said State."  (*Id*., § 11.)

*Federal Preemption Principles*

There are three generally recognized types of federal preemption:  express, field, and conflict preemption.  Conflict preemption is, itself, separated into two flavors, impossibility and obstacle preemption.  (See *Tohono O'odham Nation v. City of Glendale* (9th Cir. 2015) 804 F.3d 1292, 1297.)  This case deals only with obstacle preemption, which "arises when a challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Ibid.*)

"In every preemption analysis, congressional intent is the ' "ultimate touchstone" ' [citations] and the statutory text the best indicator of that intent [citation]. As a majority of the current United States Supreme Court has agreed at one time or another, 'preemption analysis is not "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," [citation], but an inquiry into whether the ordinary meanings of state and federal law conflict.' " (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 939–940.)

Obstacle preemption "requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was. Ultimately, 'what constitutes a "sufficient obstacle [for a finding of implied preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." ' " (*Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298, 312.)

"We 'conduct[] the search for congressional intent through the lens of a presumption against preemption. [Citations.] The presumption is founded on "respect for the States as 'independent sovereigns in our federal system' "; that respect requires courts "to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' " [Citation.] The strength of the presumption is heightened in areas where the subject matter has been the long-standing subject of state regulation in the first instance; where federal law touches "a field that ' "has been traditionally occupied by the States," ' " the party seeking to show preemption "bear[s] the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.' " ' [Citations.] The presumption applies to the scope as well as the existence of preemption." (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316,

332.) Thus, where application of the law will frustrate federal objectives in some circumstances, but not in others, the law is preempted only to the scope of the obstacle created by the state law. (See *Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 426–427 [finding state law does not conflict with federal immigration laws "insofar as it makes available to such workers the remedy of *prediscovery period* lost wages for unlawful termination"].)

## *Federal Preemption Analysis*

In line with these principles, we begin by considering the purpose of the Raker Act. From our summary of the law, above, we can reach several conclusions about Congress's intent when enacting the Raker Act. First, although styled in the form of a right-of-way grant, the Raker Act's provisions show that Congress contemplated a much more complex arrangement with San Francisco than simply granting a right of way. Rather, the Act appears to be part of a comprehensive resolution to a major need for water and electrical power in a burgeoning metropolitan area that both resolves that problem and provides the federal government with benefits it would otherwise lack absent the planned use for the land at issue. Thus, San Francisco was provided with both the land needed to support, and directions to implement, a massive undertaking with respect to water storage, transportation, and electrical generation. In exchange, the federal government was able to establish some control over the construction and operation of the facilities, preserve senior water rights that it would not otherwise have control over, ensure specific amounts of electrical power would be generated, set how portions of both the water diverted and power generated could be sold, secure water rights for the War Department, limit San Francisco's ability to remove water from the Tuolumne watershed, and obtain land and building commitments designed to preserve as much of the scenic beauty of the area as possible given the grants provided.

14.

Second, the many provisions concerning the authority of the federal government to control aspects of the completed project, ensure timely creation of the planned construction sites, and obtain either full control over the lands should such provisions not be followed or substantial continuing enforcement rights or payments upon completion shows Congress intended much of the construction allowed on its lands to be permanent. Thus, Congress retained control over exactly where the rights of way would be through the requirement that maps be authorized by the federal government, set rules for how the future water source must be managed in the form of pollution restrictions, insisted on permanent payments to maintain trails and other features, limited the ability for San Francisco to sell diverted water while allowing the city and county to recoup the costs of the dam, and authorized the enforcement of these provisions, among others.

Third, and most pertinent to this appeal, the Raker Act shows Congress intended for a dam to be built in the Hetch Hetchy Valley that would flood the area and create the Hetch Hetchy Reservoir. This is most readily shown through section 9, subdivision (k), which requires vigorous construction of a dam at least 200 feet high when development of the Hetch Hetchy Reservoir begins. However, it is further supported by section 9, subdivision (p)'s requirements that a trail be constructed around the Hetch Hetchy Reservoir site and that a pipe be placed in a specific location near the Hetch Hetchy Dam site; along with section 4's express recognition that San Francisco could cut timber in the Yosemite National Park on land to be submerged due to the grant. Finally, we find it notable that Congress even reserved partial authority over where within the Hetch Hetchy Valley the dam would be built, stating in section 2 that no permanent construction work could begin until San Francisco filed, and the Secretary of the Interior approved, maps showing the boundaries, locations, and extent of the proposed rights of way and lands required for the purposes of the Act.

When taken together, these aspects of the Raker Act demonstrate that Congress, in granting the right of way, intended that a specific dam be built in a specific location, that the federal government have some level of oversight of that dam, its construction, and its water, along with the related electrical power components tied to the transportation of water stored at that dam, and that the project create potentially perpetual water rights for various government entities. These purposes, then, are the areas where preemption will apply should state laws conflict.

Having considered the purposes of the Raker Act, we next turn to those aspects of article X, section 2 invoked in this case. Restore Hetch Hetchy's complaint is focused upon a core allegation, that San Francisco is "employing an unreasonable method of diverting municipal water supplies from the Tuolumne River by drowning the Hetch Hetchy Valley of Yosemite National Park with a reservoir" in violation of article X, section 2. Restore Hetch Hetchy provides a substantial number of factual assertions, all directed to this general point. These include a long list of beneficial uses the Hetch Hetchy Valley could be put towards were the O'Shaughnessy Dam not present. Restore Hetch Hetchy claims these uses outweigh the beneficial use of providing municipal water supplies via the reservoir. Included in these factual assertions are substantial financial comparisons between the value of an unencumbered valley and the cost necessary to preserve the currently existing water reserves and electrical power generated from the Raker Act projects. Such comparisons also attempt to demonstrate that the O'Shaughnessy Dam is no longer needed because equivalent and greater water reserves have since been added to the overall system. Our review of the factual assertions made reveals no other supportable legal theory under article X, section 2 and we have been pointed to none supported by the record.[7]

_____

[7]     We recognize amicus State Water Resources Control Board asserts that the unreasonable diversion component of article X, section 2 could include unreasonable diversion due to harm to fish or improper water temperatures, among others. Relatedly, amicus Huey Johnson,

16.

Comparing, then, the purposes of the Act as we have described them and the aspects of article X, section 2 invoked in this case, we conclude the two create a conflict. This suggests that article X, section 2 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as exposed in the Raker Act. The Raker Act intends to place a permanent diversion point, in the form of a dam, in the Hetch Hetchy Valley in a manner that will intentionally flood that land. Those aspects of article X, section 2 invoked in this case would deem this congressional directive to be an unreasonable diversion of water under California law based on the location of the dam, its cost effectiveness, or its effect on the surrounding area. As framed, the two sets of laws cannot stand in tandem, meaning those conflicting aspects of article X, section 2 must stand aside.

Restore Hetch Hetchy contests this conclusion by pointing to section 11 of the Raker Act, the so-called savings clause. According to Restore Hetch Hetchy, the phrase "nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the State of California relating to the control, appropriation, use, or distribution of water . . ." is so broad that it "preserves California's water appropriation and distribution laws for all of the features for which Congress granted San Francisco a right-of-way, including the O'Shaughnessy Dam and Hetch Hetchy Reservoir." Rejecting comparisons to similar language in the earlier enacted Reclamation Act, which has been interpreted not to save state laws inconsistent with specific directives in the federal legislation from exemption, and focusing on the legislative history of the Raker Act, Restore Hetch Hetchy argues that all aspects of

Daniel Lungren, John van de Kamp, Douglas Wheeler, and the Earth Island Institute assert there are a broad list of potential remedies available aside from removing the dam and that the trial court focused too tightly on the alleged relief at issue. However, we have been pointed to no factual assertions in the record supporting such legal theories regardless of the potential relief that may exist. Thus, regardless of the full scope of article X, section 2, we see nothing in the record that would broaden this case beyond the allegations made in the petition.

article X, section 2 are applicable to the continued operation of the O'Shaughnessy Dam through the express language of the savings clause.

We do not agree. The United States Supreme Court has "repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.' " (*Geier v. American Honda Motor Co., Inc.* (2000) 529 U.S. 861, 870.) Indeed, in analyzing other savings clauses which potentially conflict with the express purposes of a federal statute, the Court has explained such clauses cannot grant rights "the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." (*Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.* (1907) 204 U.S. 426, 446; see *AT&T v. Central Office Telephone* (1998) 524 U.S. 214, 227–228.)

Contrary to Restore Hetch Hetchy's position, we find *Ivanhoe Irrigation District v. McCracken* (1958) 357 U.S. 275, 291-292, *Fresno v. California* (1963) 372 U.S. 627, 629-630, and *California v. United States* (1978) 438 U.S. 645, 673–674 (*California*), instructive in our analysis. While those cases dealt with similar savings-clause language contained in the Reclamation Act, their usefulness comes not from the similarities in the language with the Raker Act but from the key components of the analysis utilized to determine when federal law preempts state. As explained in *California*, "*Ivanhoe* and *City of Fresno* involved conflicts between § 8 [the savings clause of the Reclamation Act], requiring the Secretary to follow state law as to water rights, and other provisions of Reclamation Acts that placed specific limitations on how the water was to be distributed," while *California* itself dealt with the argument that state law is preempted "even if no explicit congressional directive conflicts with the conditions imposed." (*California*, at p. 673.) In that later context, the Supreme Court disavowed prior language limiting its interpretation of the Reclamation Act's savings clause, "to the extent it would prevent petitioners from imposing conditions on the permit granted to the United States

18.

which are not inconsistent with congressional provisions authorizing the project in question," but made no general overhaul of the conclusions in *Ivanhoe* and *City of Fresno* that directly conflicting requirements in state laws are preempted, regardless of the breadth of the savings clause. (*California*, at pp. 674–675.)

This clarification of the nature of the preemption analysis was shortly thereafter applied by our California Supreme Court in the case of *Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 191–193. There, our high court found a federal statute that specifically authorized the construction of a dam and canal, but expressly created a process for determining from where water should be diverted that required "due consideration" of the California Water Plan and "consult[ation] with local interests through public hearings," resulted in preemption of any challenges to the construction of the dam and canal but not to restrictions placed on the diversion point. (*Environmental Defense Fund*, at p. 193.) Consistent with *Ivanhoe*, *City of Fresno*, and *California*, this analysis applied preemption in instances where direct conflicts existed with express provisions while avoiding preemption where no direct conflict was created.

We conclude this same analytical framework applies to consideration of the Raker Act's savings clause. Congress's intent in enacting the Raker Act is best exemplified by the explicit commands given to San Francisco regarding actions it must take upon accepting the right-of-way grant and the retention of substantial oversight in where the dam will be located and how it will be run. In the context of the allegations of this case, as detailed above, these commands required the construction of a dam that would flood the Hetch Hetchy Valley and the continued operation of that dam in a manner that would necessarily change the landscape of the valley. Importantly, and distinguishing this case from those like *Environmental Defense Fund*, Congress provided no explicit directive that the construction of the dam or the flooding of the valley be subject to continued consultation with California. Rather, the Act insists upon prompt construction and

19.

efficient completion of the project, resulting in the flooding of Hetch Hetchy Valley. This intent directly conflicts with Restore Hetch Hetchy's allegations that the continued operation of the dam, in a manner that floods the Hetch Hetchy Valley, is an unreasonable manner of diverting water. The two cannot be reconciled. Congress intended to permanently flood the valley through its right-of-way grant. That intent cannot be overcome by the Act's general saving clause, one that preserves California law but only in matters not in direct conflict with the requirements of the Act itself. No further relevant allegations are made under article X, section 2. As such, the trial court correctly concluded Restore Hetch Hetchy's claims are preempted under federal law.

Having concluded appellant's claims fail under preemption principles, we need not reach the trial court's alternative holding that the claims are time barred. We take no position on that conclusion.

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondents.


_____
HILL, P.J.

WE CONCUR:


_____
POOCHIGIAN, J.


_____
MEEHAN, J.

20.

## <u>CERTIFIED FOR PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RESTORE HETCH HETCHY, | F074107 |
| Petitioner and Appellant, | |
| v. | (Tuolumne Super. Ct. No. CV59426) |
| CITY AND COUNTY OF SAN FRANCISCO et al., | |
| Respondents; | **Order Granting Requests for Publication** |
| MODESTO IRRIGATION DISTRICT et al., | |
| Real Parties in Interest and Respondents. | |

As the nonpublished opinion filed on July 9, 2018, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.


HILL , P.J.

WE CONCUR:



POOCHIGIAN, J.



MEEHAN, J.


1.